J-A09040-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF:  A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1289 WDA 2024 |

Appeal from the Order Entered September 25, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000004-2024

BEFORE:  KUNSELMAN, J., NICHOLS, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: June 11, 2025**

A.B. ("Father") appeals from the order terminating his parental rights to his child, A.B. ("Child"), born in June 2021.  We affirm.

On January 31, 2022, the Allegheny County Office of Children, Youth, and Families ("CYF") received a report that: C.W. ("Mother") was keeping heroin needles near Child's spoon; Mother had "track marks;" Father appeared to be under the influence and looked unwell; and Mother needed to turn herself in to law enforcement authorities, leaving Child solely in the care of Father.  N.T., 8/2/24, at 11.  Following a visit, CYF determined that Child could not remain in the care of Mother and Father (collectively, "Parents") due to substance abuse concerns and "items found around the home."  ***Id***.

On February 3, 2022, CYF obtained protective custody over Child.  Since that time, Child has remained in the custody of maternal cousins ("Foster Parents").  Foster Parents are a pre-adoptive resource for Child.

The Juvenile Court adjudicated Child dependent on May 18, 2022. On that same date, the court found that Father was Child's father. The court established reunification goals for Father, which required him to: participate in drug and alcohol treatment, have an updated drug and alcohol evaluation, and submit to random weekly urine screens; obtain appropriate housing; and visit with Child.

On January 3, 2024, CYF filed the underlying petition to terminate Parents' parental rights. The Orphans' Court conducted a hearing on the termination petition on August 2, 2024.[1] Keri Vanderpool ("Vanderpool"), CYF Casework Supervisor, testified to the following. With respect to his drug and alcohol goals, Father completed two assessments, and he participated in inpatient and outpatient treatment at Tadiso and Cove Forge in 2022 and 2023. *See* N.T., 8/2/24, at 42, 46. However, Father did not provide CYF with documentation reflecting his completion of either of these drug and alcohol treatment programs. *See id*. at 17.

---

[1] The Orphans' Court appointed KidsVoice to serve as Child's counsel and guardian *ad litem* ("GAL") in this matter, finding that there was no conflict between Child's best interests and legal interests. *See* Order, 3/20/24; *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (holding that, where Orphans' Court appoints same party to serve as legal interest counsel and GAL, "appellate courts should review *sua sponte* whether the [O]rphans' [C]ourt made a determination" that the child's legal interests and best interests "did not conflict"). KidsVoice advocated for the termination of Father's parental rights at the hearing and has filed a brief in this Court in support of the affirmance of the termination order.

CYF scheduled Father for ninety-seven drug screens between March 2022 and July 2024, and he only attended nine. *See id*. at 17-18, 44. Father tested positive for marijuana on each of the drug screens he attended and did not provide evidence that he had a medical marijuana card. *See id*. at 44, 47-48.

Concerning visitation, Father was permitted two supervised visits with Child per week, and additional virtual visits. *See id*. at 18. Father did "[n]ot consistently" attend the visits. *Id*. at 43. For example, during the 2024 calendar year, Father attended only eleven of the twice weekly scheduled visits. *See id*. Based on his lack of compliance with drug screens, Father never progressed to unsupervised visits. *See id*. at 19, 44. Father did not obtain housing appropriate for reunification with Child. *See id*. at 18.

Vanderpool also testified regarding her personal observations of Child in the kinship foster home. Child appeared happy and carefree during the visits and shared a parental bond with Foster Parents. *See id*. at 19. Foster Parents provided for all of Child's needs and ensure that he attends necessary medical appointments. *See id*. at 20. Child did not have special needs. *See id*. While no other children lived in the foster home, Child had regular contact with cousins and an older half-sister. *See id*. at 19-21.

Sherri Ihrig ("Ihrig"), CYF Permanency Caseworker, testified to the following. Ihrig's first involvement with Child's case was in July 2023, when she began working on an adoption home study of Foster Parents' home. *See id*. at 49-51. Ihrig visited the foster home every other month from that point

forward, where she had the opportunity to observe Child's interactions with Foster Parents. *See id*. at 51, 56. Ihrig described Child as "a happy little boy," with many toys, several pets, and frequent interaction with extended family. *Id*. at 56. Ihrig stated that Child was comfortable in the home, healthy, and recently "had a good checkup" at the dentist. *Id*. Foster Parents informed Ihrig on numerous occasions that they did not intend to cut Child off from Parents or extended family. *See id*. at 54, 70.

Ihrig became the "direct service caseworker" for Child's case in April 2024, and she reached out to introduce herself to Parents at that time. *Id*. at 49-51. Father did not respond to Ihrig, until three days prior to the hearing when he called her. *See id*. at 52. Father stated in that conversation that he did not know what was happening with Child's case and denied missing many recent visits with Child. *See id*. at 53. Father informed Ihrig he was unable to complete a drug and alcohol program or his other court-ordered goals because he was working long hours and had recently become manager at his job. *See id*. at 53, 72-73. Father said that it was still his intention to reunite with Child, but he wanted to obtain his own housing first as he was then living with his mother. *See id*. at 53-54, 73. Ihrig reiterated that Father had a poor attendance record at scheduled visits in the months prior to the hearing, leading Foster Parents to remark that it was "like Father dropped off the face of the earth." *Id*. at 75.

CYF also presented psychologist Terry O'Hara, Ph.D. ("Dr. O'Hara"), as an expert in forensic psychology. He testified to the following. Dr. O'Hara

completed an interactional evaluation of Child with Foster Parents on April 2, 2024. ***See id***. at 78. Dr. O'Hara observed several positive parenting skills during his interaction with Foster Parents, including that they were: interactive with Child; redirected and praised him; were open to Parents having contact with Child; and understood the importance of different cultures and backgrounds. ***See id***.

Dr. O'Hara observed indicators of a secure attachment between Child and Foster Parents. ***See id***. at 80. Child directed himself to Foster Parents and was happy, smiling, playful, and vocal in their company. ***See id***. at 79-81. Dr. O'Hara stated that he had no concerns regarding Child's engagement with Foster Parents, as they "presented with significant ability, [had] strong parenting skills, and [Child] really engaged well with them." ***Id***. at 79, 98. Dr. O'Hara opined that there would be "significant detriment" to Child if the court severed his relationship with Foster Parents. ***Id***. at 98. Dr. O'Hara emphasized that permanency of caregivers was "crucial" for a foster child, as it provided the "foundation for appropriate development for children." ***Id***. at 99.

On April 9, 2024, Dr. O'Hara completed an individual evaluation of Father and an interactional evaluation with Father and Child. ***See id***. at 81, 84. Father reported that he achieved sobriety on March 27, 2023. ***See id***. at 82. Father reported difficulty in completing day-to-day tasks, such as cleaning up after himself, which Dr. O'Hara stated "could potentially impact an adult's ability to parent in terms of organization, scheduling appointments, [and]

following through with appointments." *Id*. Father also reported overactivity and occasional impulsivity, which could "have a negative effect in relation to reacting without thinking in a way that does[ not] prioritize a child's needs." *Id*.

Dr. O'Hara diagnosed Father with: unspecified depressive disorder; moderate opioid use disorder — sustained remission; mild stimulant use disorder; and suspected physical spouse or partner abuse — physical violence. *See id*. at 83. Dr. O'Hara described several potential negative impacts from these diagnoses on Father's ability to parent, including: potential drug relapse; difficulty in prioritizing the needs and welfare of a child; safety concerns; and a lack of structure and consistency. *See id*. at 83-84.

During the interactional evaluation, Child smiled and laughed, became more engaging and vocal as the evaluation progressed, and directed himself to Father consistently. *See id*. at 85. Child referred to Father as "Dad." *Id*. Dr. O'Hara stated that the interaction indicated a secure attachment between Father and Child. *See id*. However, he noted Father's lack of consistency in visitation as a "potential limitation[] to security," as Child would not view Father as a dependable figure in his life. *Id*.

Dr. O'Hara opined that he did "not have evidence" that Father was able to provide full-time care for Child. *Id*. at 92. Dr. O'Hara noted multiple specific concerns that led him to this conclusion: Father's long-standing involvement with CYF; his long-term substance abuse concerns, including his

lack of attendance at drug screens; his minimal progress on achieving the court-ordered goals for reunification; his not having any of his older children in his care; his inability to address mental health issues; and his significant criminal history. *See id*. at 92-95.

Dr. O'Hara opined that there would be potential detriment to Child if Father's parental rights were terminated, given the relationship he observed between the two during the interactional evaluation. *See id*. at 95. However, Dr. O'Hara stated "there might be some limitations with detriment" based on Father's lack of consistency in visitation as children cannot "rely on parents as consistent parties who they can depend on in the absence of quality and consistent contact." *Id*. at 96. Dr. O'Hara indicated that the court must balance any potential detriment to Child against the potential that Father would be unable to "sufficiently demonstrate stability and address the issues which necessitated placement for" Child. *Id*. Dr. O'Hara further stated that Child's secure attachments to Foster Parents would mitigate any detriment caused by termination of Father's parental rights: "When children experience security and attachment with at least one caregiver, children are able to tolerate distress much better than children who do not have that relationship with a caregiver." *Id*. at 97.

Father testified to the following. He first attended Tadiso for drug and alcohol treatment and later completed his treatment at Cove Forge. *See id*. at 154-55. Father admitted to missing numerous drug screens but denied

that CYF scheduled him for ninety-seven screens. *See id*. at 159-61. He said that he had "no excuse" for missing the screens. *Id*. at 159. Father has not used hard drugs since March 27, 2023. *See id*. at 156. He continues to use marijuana for his "trouble eating," but he does not have a medical marijuana card. *Id*. at 158, 160.

Father had been engaged in mental health treatment but stopped attending to focus on saving for housing. *See id*. at 154-56. As of the date of the hearing, Father was living with his mother and working at a deli, where he recently became manager. *See id*. at 155.

Father described his visits with Child as "great." *Id*. at 156. Child was "excited every time" he visited. *Id*. Father stated that he consistently attended visits with Child until the month prior to the termination hearing. *See id*. at 159.

On September 25, 2024, the Orphans' Court entered the underlying order terminating Father's parental rights to Child, under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[2] Father filed a timely notice of appeal, along with a Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal. The court subsequently filed an opinion pursuant to Rule 1925(a).

Father presents the following issues for our review:

1. Did the [Orphans' C]ourt abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate

---

[2] The Orphans' Court also terminated Mother's parental rights to Child. This panel affirms that termination order at Superior Court docket 1288 WDA 2024.

Father's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1), (2), (5), (8)[,] and (b) where there was not clear and convincing evidence of abuse, refusal, or neglect by Father and where conditions which led to the removal of [C]hild either no longer exist or can be remedied within a reasonable time?

2. Did the [Orphans' C]ourt abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of [C]hild pursuant to 23 Pa.C.S.[A.] § 2511(b) when the record would not support such a conclusion?

Father's Brief at 6.

When reviewing a decree terminating parental rights, we accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

. . . [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (citations omitted).

We apply a bifurcated analysis to determine whether termination of parental rights is proper under Section 2511.

- 9 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id*. (citation and brackets omitted). To satisfy the clear and convincing evidence standard, the petitioner must present evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id*. at 56-57 (citation omitted).

The Orphans' Court determined that CYF met its burden to terminate Father's parental rights under Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court's decision as to any one subsection of Section 2511(a), in addition to subsection (b), to affirm the termination of Father's parental rights. *See id*. at 57. Here, we examine the propriety of the court's ruling under subsections (a)(8) and (b), which provide:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * * *

- 10 -

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), the petitioner must present clear and convincing evidence: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *Interest of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022).  Unlike other Section 2511(a) subsections, subsection (a)(8) "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement" of the child.  *Id*.  Instead, the relevant inquiry "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id*. (citation omitted).

Under this subsection, the court "shall not consider any efforts by the parent to remedy the conditions described [in the termination petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

[B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Interest of M.E.*, 283 A.3d at 832 (citation omitted).

In his first issue, Father argues that CYF failed to prove by clear and convincing evidence that the conditions which led to Child's removal and placement continue to exist. Father contends that he "was working on all of his" court-ordered goals for reunification with Child and he "worked with all required services and successfully completed many of said services." Father's Brief at 17. Father further asserts that CYF did not demonstrate that termination of Father's parental rights best served Child's needs and welfare because he demonstrated good parenting skills and shared a close bond with Child.

The Orphans' Court concluded that CYF met its burden under Section 2511(a)(8). The court observed that the conditions which led to Child's removal were Parents' abuse of drugs and alcohol; exposure of Child to dangerous substances; and leaving Child without proper parental care. The court found Father "did not produce any evidence [to CYF] that he had successfully completed a drug and alcohol program." Orphans' Court Opinion,

11/21/24, at 18. The court observed that Father did not obtain housing that was suitable for reunification with Child. The court further noted that Father was never able to progress to supervised visitation with Child.

The Orphans' Court found that, although severance of the parent-child bond would have a negative impact on Child, termination of parental rights would nevertheless best serve Child's needs and welfare. The court emphasized that Child was in a pre-adoptive foster home and had a strong bond with Foster Parents.

Based on our review, we conclude the evidence supports the Orphans' Court findings that termination of Father's parental rights was appropriate under Section 2511(a)(8). *See Interest of K.T.*, 324 A.3d at 56. With respect to the first element under subsection (a)(8), there is no dispute that Child was in CYF's care for more than twelve months. *See Interest of M.E.*, 283 A.3d at 832. At the time of the hearing on the termination petition, Child had been out of Parents' care for more than thirty months.

Turning to the second element, there is ample support in the record for the Orphans' Court's determination that the conditions which led to Child's removal still existed. *See id*. The evidence demonstrates that Father did not comply with any of his court-ordered goals, relating to drug and alcohol treatment, housing, and visitation. With respect to his substance abuse goals, Father completed two drug and alcohol assessments and participated in inpatient and outpatient treatment programs. *See* N.T., 8/2/24, at 42, 46.

However, he did not complete any of the drug and alcohol programs. ***See id***. at 17. Father only attended nine of the ninety-seven drug screens scheduled by CYF. ***See id***. at 17-18, 44. He tested positive for marijuana on each of the screens he attended, notwithstanding the fact that he does not have a medical marijuana card. ***See id***. at 44, 47-48, 160.

Father also failed to obtain housing appropriate for reunification with Child. ***See id***. at 18. As of the date of the hearing, Father was living with his mother and saving to obtain his own housing. ***See id***. at 155. With respect to his visitation goal, Father did not consistently attend visits with Child. ***See id***. at 43. His failure to attend visits was particularly pronounced in the months leading up to the termination hearing. ***See id***. at 75. Father was not able to progress to unsupervised visits with Child due to his lack of compliance with drug screens. ***See id***. at 19, 44. Therefore, the court did not abuse its discretion by finding that the conditions which led to Child's removal continued to exist.

With respect to the third element of Section 2511(a)(8), we discern no abuse of discretion in the Orphans' Court's finding that termination of Father's parental rights best served Child's needs and welfare. ***See M.E.***, 283 A.3d at 832. As explained in more detail below in our subsection (b) analysis, Child had been in the care of Foster Parents for approximately thirty months at the time of the hearing, far longer than he spent in Father's care. Foster Parents shared a strong bond with Child and provided for all of his needs. While

termination would sever a bond between Child and Father, the court was within its authority to prioritize the continuity of Child's relationship with his current caregivers.

Accordingly, we conclude the Orphans' Court did not err or abuse its discretion in finding CYF established grounds for termination of Father's parental rights under Section 2511(a)(8). *See Interest of K.T.*, 324 A.3d at 56. Because we agree with the court as to subsection (a)(8), we need not reach the merits of Father's argument pertaining to subsections (a)(1), (a)(2), and (a)(5). *See id*. at 57.

In his final issue, Father asserts the trial court abused its discretion in finding CYF presented sufficient evidence for termination under Section 2511(b). The Section 2511(b) analysis considers the matter from the child's perspective and places the child's developmental, physical, and emotional needs over the concerns of the parent. *See Interest of K.T.*, 324 A.3d at 59. The trial court must consider the emotional bond between the parent and child, with the threshold for the bond inquiry being whether termination will sever a necessary and beneficial relationship. *See id*. at 59-60.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care . . . ; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id*. at 59 (citation omitted).

- 15 -

Father argues that termination of his parental rights did not best serve Child's needs and welfare because it would unnecessarily and permanently deprive Child of his relationship with Father. Father asserts that he "loves [Child] and has much to offer for his benefit." Father's Brief at 19. Father maintains that Child "deserves to have his relationship with Father preserved, which can only be assured if Father retains his [parental] rights." *Id*.

The Orphans' Court found that, considering Child's current needs and projected development, termination of Father's parental rights best served Child's needs and welfare. The court observed that Child "is in a pre-adoptive foster home and clearly has a strong bond with both of his Foster Parents." Orphans' Court Opinion, 11/21/24, at 21. The court recognized that Father and Child share a bond and that severing that bond would have an adverse impact on Child. Nevertheless, the court concluded that placement of Child in a permanent home with Foster Parents outweighed the harm from severing the bond.

After careful review, we determine the evidence supports the Orphans' Court's findings and Section 2511(b) analysis. *See Interest of K.T.*, 324 A.3d at 56. The court was free to weigh the adverse impact from the severing of Father's bond with Child against the detriment Child would face if his relationship with Foster Parents ended. *See id*. at 60. While Father undoubtedly had a bond with Child, Dr. O'Hara observed that Father's lack of consistent visitation potentially limited the detriment Child would face upon

termination because children cannot "rely on parents as consistent parties who they can depend on in the absence of quality and consistent contact." *Id*. at 96. Dr. O'Hara further indicated that the court must balance any detriment to Child from termination against the possibility that Father would be unable to "sufficiently demonstrate stability and address the issues which necessitated placement for" Child. *Id*.

Additionally, there was ample evidence of record that Foster Parents provided for all of Child's needs, demonstrated excellent parenting skills, and shared a strong bond with Child. *See id*. at 19-20, 56, 78-79, 98. Indeed, Dr. O'Hara opined that there would be a "significant detriment" to Child if he lost his relationship with Foster Parents, with whom he had lived for the great majority of his young life and who were a pre-adoptive resource. *Id*. at 98. Moreover, Dr. O'Hara found that the security and strong attachment Foster Parents provide for Child would help to mitigate any harm caused by the termination of Father's parental rights. *See id*. at 97.

In light of the foregoing, we do not disturb the order of the Orphans' Court terminating Father's parental rights to Child.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/11/2025